# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

HEATHER A. WERT,                      Case No. 1:17-cv-477
       Plaintiff,                        Barrett, J.
                                           Litkovitz, M.J.

      vs.

COMMISSIONER OF                  **REPORT AND**
SOCIAL SECURITY,                **RECOMMENDATION**
       Defendant.

Plaintiff Heather A. Wert brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and

supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 14), the Commissioner's response in opposition (Doc. 20), and plaintiff's reply

(Doc. 25).

## I. Procedural Background

Plaintiff filed her applications for DIB and SSI in October 2013, alleging disability since

October 22, 2011, due to bipolar disorder, obsessive/compulsive disorder, schizoid personality,

hypothyroidism, depression, anxiety, "TMBD," and migraines. (Tr. 294). After initial

administrative denials of her claim, plaintiff appeared with a non-attorney representative and

testified at a hearing before administrative law judge (ALJ) Paul W. Jones on March 22, 2016. A

vocational expert (VE) also testified at the hearing. On April 13, 2016, the ALJ issued a decision

denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals

Council was denied, making the decision of the ALJ the final administrative decision of the

Commissioner.

**II.  Analysis**

    **A.  Legal Framework for Disability Determinations**

        To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

        Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

        1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

        2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

        3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

        4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

        5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to

2

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B.   The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. [Plaintiff] meets the insured status requirements of the Act through December 31, 2017.
>
> 2. [Plaintiff] has engaged in substantial gainful activity since October 22, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).[1]
>
> 3. [Plaintiff] has the following severe impairments: schizoaffective disorder, bipolar disorder, anxiety disorder, and personality disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, [the ALJ] find[s] that [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [plaintiff] is limited to only occasional changes in a work setting and occasional public interaction.

---

[1] The ALJ found that plaintiff engaged in substantial gainful activity in 2012, when she earned $15,200.85, and in 2013, when she earned $13,684.31.  (Tr. 21).  However, the ALJ deferred additional development of the record on this point because he found that plaintiff was disabled at step five of the sequential evaluation process.  (*Id.*).

6. [Plaintiff] cannot perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. [Plaintiff] was born [in] . . . 1983 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. [Plaintiff] has at least a high school education and can communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," if or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. [Plaintiff] has not been under a disability, as defined in the Act, from October 22, 2011, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-28).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v.*

---

[2] Plaintiff's past relevant work was as a retail sales clerk, a semiskilled position which plaintiff performed at the light to medium level of exertion; a file clerk, a light exertion, semiskilled position; and a telephone sales representative, a sedentary, semiskilled position.  (Tr. 27, 69-70).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium exertion occupations such as a stock clerk (300,000 jobs nationally), packager (600,000 jobs nationally), and cleaner (40,000 jobs nationally).  (Tr. 28, 71-72).

4

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D.  Specific Errors**

On appeal, plaintiff argues that the ALJ erred: (1) by failing to give controlling weight to the opinion of plaintiff's treating psychiatrist, Dr. Renu Kotwal, M.D.; (2) by failing to address the medical source statements provided by plaintiff's treating licensed therapist, Linda Houston,

MA, LPCC, NCC; and (3) by determining that plaintiff's migraine headaches are not a severe impairment.   (Docs. 14, 25).

**1.  Weight to the treating psychiatrist's opinion**

Plaintiff alleges as her first assignment of error that the ALJ failed to give controlling weight to the opinion of her treating psychiatrist, Dr. Kotwal.

*i.     Treating physician standard*

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.   Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242-43 (6th Cir. 2007) (citing Soc. Sec. Rul. 96-2p[4], 1996 WL 374188 (July 2, 1996[5]); *Wilson*, 378 F.3d 541, 544 (6th Cir. 2004)).  The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242-43.

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not

---

[4] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner."  *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 272 n. 1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)).  The Sixth Circuit has refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social Security Regulations but has assumed that they are.  *Id*. (citing *Wilson,* 378 F.3d at 549).

[5] SSR 96-2p was rescinded effective March 27, 2017.  *See* 82 FR 5844-01, 2017 WL 168819, at *5844-45, 5869, 5880.  Since plaintiff's claim was filed prior to March 27, 2017, SSR 96-2p applies to this case.

inconsistent with the other substantial evidence in [the] case record[.]"  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)[6]; *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source.  *Wilson*, 378 F.3d at 544.  *See also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. §§ 404.1527(c), 416.927(c)) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4). In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ's reasons must be supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5).  This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of her case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled,"

---

[6] These regulations were in effect until March 27, 2017, and therefore apply to plaintiff's claim filed in 2013.  For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions.  82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).

and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544.

"A failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers*, 486 F.3d at 243). *See also Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545) (remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" and the ALJ's opinion does not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.).

Remand is not necessary if the ALJ's failure to provide good reasons is a "harmless *de minimis* procedural violation." *Blakley,* 581 F.3d at 409. The Sixth Circuit has identified three situations in which harmless error might occur: "(1) where the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) where "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," and (3) "where the Commissioner has met the goal of . . . the procedural safeguard of reasons." *Shields v. Comm'r. of Soc. Sec.*, No. 17-6091, 2018 WL 2193136, at *8 (6th Cir. May 14, 2018) (quoting *Wilson*, 378 F.3d at 547). The goal of the procedural safeguard may be met when the "'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Id*. (quoting *Friend,* 375 F. App'x at 551). Where the ALJ's error

8

"makes meaningful review impossible, the violation of the good-reasons rule can never qualify as harmless error." *Id*. (quoting *Blakley*, 581 F.3d at 409).

Opinions from non-treating and nonexamining sources are never assessed for "controlling weight." A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6); *Wilson*, 378 F.3d at 544. Because a nonexamining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a nonexamining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Under the Social Security regulations, the opinions of state agency medical consultants may be entitled to significant weight where they are supported by record evidence. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013); 20 C.F.R. §§ 404.1527(e), 416.927(e).

### ii. *Dr. Kotwal's treatment records and assessment*

Dr. Kotwal first saw plaintiff on May 21, 2013, on referral from Ms. Houston for evaluation and further medical management of symptoms of schizoaffective disorder bipolar type, schizoid personality disorder, and obsessive compulsive disorder (OCD). (Tr. 540-42). Plaintiff reported some suicidal ideation, delusions, and paranoia. She reported a history of mood problems from a very early age for which she saw counselors at school very early on. She reported being withdrawn, sad and weepy, and struggling with anxiety as a child. She reported

9

long stretches in the past of not being able to sleep for four nights and five days during which her mind would race. She had been admitted to the Lindner Center of Hope for five days in April 2011. (Tr. 541). Plaintiff reported her moods were "still low" despite her current medications (Wellbutrin, Valium as needed for anxiety, Citalopram, and Benadryl); she "still struggles with anxiety, concentration is not good, daydreams a lot, all this effects [sic] her ability to work well"; and "her moods have been depressed for past 2 weeks, low energy, and also has some passive thoughts of death" but without plan or intent. Plaintiff needed Benadryl to sleep and got six hours of sleep at night. Her concentration was "[h]orrible, just can['t] get out of my own head[.]" She reported she did not "do much at home," she worked at a book store but her performance had "not been very good" and she was on an attendance action policy, and she did not have any relationships. She had a history of self-mutilation, or cutting. She also had a history of high moods lasting up to a couple of weeks characterized by insomnia, high energy, high focus, accomplishing things, becoming talkative and euphoric, and possibly spending too much money. Past medications included trials of Abilify, Seroquel and Xanax; Citalopram dose of 120 mgs was decreased after two years due to diaphoresis; and Wellbutrin was added. Mental status examination findings included depressed mood, slowed and low volume speech, constricted affect, fair attention, concentration and memory, occasional auditory hallucinations and paranoid delusions, and fair to limited insight/judgment. Dr. Kotwal diagnosed schizoaffective disorder bipolar type in light of reported past hypomanic episodes and major depressive episodes, off and on psychotic symptoms, underlying paranoia, and some auditory hallucinations. Dr. Kotwal recommended that plaintiff taper and discontinue antidepressants as they could be "part of the problem" and that plaintiff start a mood stabilizer to target her mood

swings. Dr. Kotwal adjusted plaintiff's medications by discontinuing Wellbutrin, decreasing

Celexa to 20 mgs daily, and starting Saphris, a mood stabilizer to target mood swings. Dr.

Kotwal diagnosed schizoaffective disorder bipolar type, status anxiety disorder not otherwise

specified, schizoid personality disorder, and schizoaffective disorder. She assigned plaintiff a

Global Assessment of Functioning (GAF)[7] score of 55[8].

On June 11, 2013, plaintiff reported that she was "very low" at the end of April and in

May but she was doing better with the medication changes and was doing well on the day of her

appointment. (Tr. 546-48). She was getting things done. She had suicidal thoughts off and on

but no plan or intent. She had experienced headaches almost daily over the past two weeks that

could be related to Saphris. She had to leave work early one day because of a headache.

Plaintiff took Excedrin Migraine for the headaches. Plaintiff reported stressors related to work,

she was not depressed but had some anxiety during the preceding two to three weeks that felt

like overstimulation, her sleep was not good as she slept four to five hours and then woke up

before falling back asleep for a total of six hours of sleep each night, and her concentration was

"not great" as she was "distracted easily, feels disconnected, fuzzy--mind still races." Her

---

[7] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev.
2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social,
and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of
severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with
clear expectation of death)." *Id.* at 34. An update of the DSM eliminated the GAF scale because of "its conceptual
lack of clarity . . . and questionable psychometrics in routine practice." *Id.* (citing DSM V at 16) (American
Psychiatric Ass'n, 5th ed., 2013)).

[8] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers
or co-workers)." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006). *DSM–IV–TR* at 34
(capitalization and boldface omitted).

appetite was increased.  Functionality at home was fine, and at the book store where she worked it was "50/50" and she had been getting things done there.  Dr. Kotwal adjusted her medications by starting Topamax.

On July 9, 2013, plaintiff reported she was doing "okay."  (Tr. 588-90).  She was binge eating daily.  She reported stressors related to work, and she was considering switching jobs.  She reported that overall she was much better, she was not depressed, she had sporadic irritability, and she had some occasional anxiety or "overstimulation" during the past two to three weeks.  She reported continuing sleep issues and concentration issues, and the same functionality as she had in June.  She complained about migraines that were not so severe that she had to see a doctor.  Mental status examination findings included somber expression, "good" mood, slowed and low volume speech, and constricted affect.  Dr. Kotwal adjusted her medications by discontinuing Topamax, starting Geodon at a titrated dose, tapering off Citalopram, and discontinuing Saphris.

On July 30, 2013, plaintiff was "doing okay, moods are stable, concentration is good, [and] sleep needs to improve."  (Tr. 543-45).  She had some episodes of racing thoughts.  Dr. Kotwal encouraged plaintiff to take Benadryl regularly as it helped her sleep and made that a standing order.  Mental status examination findings included constricted affect, fair memory, and limited to fair insight/judgment.  The plan was to continue the current medications, take Geodon to target moods and any underlying psychosis, take Benadryl for insomnia, and take Diazepam (Valium) as needed for anxiety, which plaintiff reported she "very rarely" needed.

On September 9, 2013, plaintiff reported she felt depressed, worried and irritable and her moods had been "bad."  (Tr. 591-93).  Plaintiff had stopped taking Geodon because it caused her

12

to be constantly dizzy and light-headed, and she had a fall that sent her to the emergency room. Sleep was not good as she had a hard time falling asleep and staying asleep, and she was taking Benadryl to help. She had a hard time falling asleep and staying asleep. She had restarted Saphris on her own and her sleep had improved over the prior two weeks. Her concentration was "better than before" with a couple of incidents of racing thoughts. Her appetite was better and she was not eating as much and was not purging. Her functionality at work was "better" and she reported she was "getting things done." She had been "a little more active." She voiced no physical complaints and no migraines, but she had dizziness on Geodon which stopped when she discontinued the medication. Mental status examination findings included "okay" mood, slowed and low volume speech, constricted affect, fair memory, and limited to fair insight/judgment. Dr. Kotwal reported that plaintiff had difficulty staying on any one medication for long due to side effects, plaintiff struggles with anxiety and moods, and plaintiff had reported she was thinking of applying for disability and this was discussed at the appointment. Dr. Kotwal adjusted plaintiff's medications by increasing Saphris to target mood stability and decreasing Geodon.

On October 8, 2013, Dr. Kotwal reported that plaintiff had "ongoing mood issues, swings, not able to function--plans to go on disability, difficult to function outside of home, either crying spells--or everything gets too much--sights sounds." (Tr. 549-51). Plaintiff reported that she felt she was unable to work because she could not be consistent. She had given her notice at work as "she gets stressed even with an easy job like this," she had started taking Citalopram on her own between appointments after stopping Geodon "as she felt low," and she was "experiencing mood swings at times and anxiety." (Tr. 549). Mental status examination

13

findings included "up and down, depressed" mood, constricted affect, fair memory, and limited to fair insight/judgment. (Tr. 550). Dr. Kotwal adjusted plaintiff's medications by decreasing Citalopram.

On December 3, 2013, plaintiff reported that she had been depressed in October but her moods were getting better despite a few low moments. (Tr. 586-87). Her energy was "so-so." Her sleep was good since restarting Saphris. She reported she was not working and that her activity level had improved since she stopped working. Her concentration was "not great" but she was not having as much anxiety as when she worked, she had read three books recently, but she was still withdrawn and kept to herself most of the time. Her appetite had been "ravenous" all through October but was back to normal. She was living with her parents and her functionality at home was "okay." Her activity level was improved since she stopped working. Plaintiff's dose of Synthroid had been increased in October due to an underactive thyroid, and Dr. Kotwal adjusted plaintiff's medications by increasing the Citalopram dose.

On February 15, 2014, plaintiff reported she was a "little rocky- - having a hard time doing anything- - sleeping a lot." (Tr. 583-85). She reported that her sleep was good since she went back on Saphris, but she was taking it only once or twice per week instead of regularly due to occasional headaches, which plaintiff felt were a side effect. She reported she was a "little down[,] little depressed" and she felt anxious at times. Her concentration was "not great--having a hard time getting out of my head--phase out, half day dream[,] half just zone out." She was not working and reportedly did not engage in much activity. Dr. Kotwal reported that plaintiff was tearful at times. Her mood was depressed and somewhat anxious. Dr. Kotwal reported that plaintiff's "[m]oods are not good, more depressive theme--no psychotic symptoms at this time--

14

more social anxiety, avoidance.  Difficulty functioning."  Dr. Kotwal adjusted plaintiff's medications by discontinuing Saphris as its drawbacks outweighed its benefits and substituting Trazadone in its place for insomnia; starting a trial of Effexor to target depression and anxiety and migraines, for which plaintiff took Imitrex as needed; and continuing Diazepam as needed for anxiety.

On April 12, 2014, plaintiff reported she was doing well.  (Tr. 581-82).  She was not working and was living with her parents, she was taking Trazadone and getting seven to eight hours of sleep each night, her mood was better though she still had ups and downs, her concentration was better and she was able to start and complete some projects, she did not engage in much activity and did not seek social contacts, and she limited herself to solitary walks.  Mental status examination findings included fair concentration, attention and memory, and limited to fair insight/judgment.  Dr. Kotwal opined that plaintiff struggles with depression with "significant social anxiety and avoidance behaviors[;] she has tried to work several times but not [sic] able to sustain due to her depression and anxiety."  Dr. Kotwal adjusted plaintiff's medications by titrating Effexor up to target depression, anxiety and worries.  Cognitive behavioral therapy (CBT) oriented work was done during the session "to target cognitions," and Dr. Kotwal encouraged plaintiff to challenge herself to increase her social activities.

On April 2, 2015, Dr. Kotwal reported that plaintiff had returned after a long gap.  (Tr. 723-24).  Plaintiff had gained weight and reported she had been binge eating for a month.  She had been working part-time in a music store for four days each week for one month and reported it was going well.  Her moods were "so-so" and "okay" overall.  March had not been good as she had a hard time pulling herself out of bed.  She reported she had gone to a training that morning

15

and was distracted, she had a difficult time staying with the subject, and she missed 10 to15

minutes of the lecture.  An ADHD (Attention Deficit Hyperactivity Disorder) screen was

administered and plaintiff screened positive.  Her sleep was pretty good overall and she slept

nine to ten hours a night.  She complained that she has "racing thoughts, brain does not shut off,"

she has irritability, and she has impulsive behaviors mainly around eating and spending money.

She complained of occasional migraine headaches for which she took Imitrex.  Her affect was

constricted; she did not have a smoothly flowing thought process and hesitated and had "some

thought blocking at times"; her attention and insight were limited to fair; and her concentration,

memory, and judgment were fair.  Dr Kotwal opined that plaintiff was doing "better than before

though even at this [sic] has significant limitations in her ability to function fully in different

aspects of her daily activities - psychosocial, personal and work."  CBT-oriented work was done

during the session to "target anxiety, cognitive and psychosocially limiting/challenging

cognitions."  Dr. Kotwal assigned a GAF score of 55.  Dr. Kotwal adjusted plaintiff's

medications by continuing Effexor at the current dose, starting Vyvanse to target symptoms of

ADHD, and starting Saphris to stabilize moods.

On April 30, 2015, plaintiff reported she was not depressed, agitated or anxious and her

thoughts were "not as sticky- can focus [and] move on to different things after finishing tasks,

has been regular and punctual" at her job in a music store where she worked six to eight hour

shifts three to four days a week, she was sleeping soundly, she was not as hungry, and her

concentration had improved.  (Tr. 721-22).  Mental status examination findings included "so, so,

okay" mood, constricted affect, a thought process without a smooth flow and with hesitation and

some thought blocking at times, and fair attention, concentration, memory, and judgment, and

16

limited to fair insight.  Dr. Kotwal opined that plaintiff was doing better than before but had

significant limitations in her ability to function fully in the psychosocial, personal and work

aspects of her daily activities.  The plan was to continue stimulants and monitor plaintiff's

response.

On June 4, 2015, plaintiff reported that the month had been "rough," starting with a

crying spell and continuing with depression or low mood for three weeks with no trigger.  (Tr.

719-20).  Sleep was problematic.  Saphris helped her sleep but for periods of 10 to 11 hours, it

was interfering with weight loss, and when she tried to hold back on the medication a little that

week her energy had improved.  She was up 30 hours one day when she missed a dose.  Sleep

had improved without the medication, but falling asleep was difficult.  She had considered

cutting herself the prior week but refrained.  Work was "not great" as she was having anxiety and

a hard time with sales.  Mental status examination findings included depressed mood, constricted

affect, hesitant thought process without a smooth flow and with some thought blocking, limited

to fair attention and insight, and fair concentration, memory, and judgment.  Dr. Kotwal opined

that plaintiff had some cycling with lower moods.  Dr. Kotwal performed some CBT-oriented

work to target "anxiety, cognitive and psychosocially limiting/challenging cognitions."  She

adjusted plaintiff's medications by decreasing Effexor XR, increasing Vyvanse, and prescribing

Saphris to stabilize moods.  She continued plaintiff on Valium for anxiety on an as needed basis.

On July 9, 2015, plaintiff complained of depression, anxiety, and difficulty functioning

and with interpersonal dynamics.  (Tr. 717-18).  She reported her moods had been good overall

lately and she was "not sure why she is crying now."  She was worried about money.  She was

still working but was getting upset, tired and anxious and "feels like she is crawling out of her

skin" when she has to work extra. She had worked six days in a row and was feeling overwhelmed. She reported she did well in June but was not doing well before that. She had moved in with a friend and planned on going back to school in January. She was seeing her therapist every two weeks. Dr. Kotwal opined that plaintiff's moods were "better." She assigned plaintiff a GAF score of 65.[9]

On August 13, 2015, plaintiff reported her mood was "mostly pretty good," she was a "little out of sorts" the last few days, and she had some mood swings. (Tr. 715-16).

On October 22, 2015, plaintiff presented with complaints of depression, anxiety and social anxiety. (Tr. 713-14). She reported she had been "very stressed for a few weeks," that her roommate had made a comment she could not stop thinking about, she was having an argument in her head and "seething with rage, could not sleep-tearful as she talked about it-reports she felt like she needed to jerk herself out of it so she cut herself on her wrist." Plaintiff reported "she has been a mess," her sister's wedding was done in October, she worked eight days in a row, she traveled to the west coast, and she "feels it all took its toll, chewing on her brain." She reported she felt "like a raw nerve," she could not filter, little things were bothering her more like having to clean a mess, answer extra questions from customers, and do daily chores. Mental status examination findings including "cutting behavior, raging thoughts." Dr. Kotwal assessed plaintiff as having "worse moods" and discussed cycling with plaintiff. She assigned plaintiff a GAF score of 55. Dr. Kotwal adjusted plaintiff's medications by tapering her off Effexor XR,

---

[9] A GAF score of 61 to 70 indicates "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." *Id.*

discontinuing Saphris, starting Depakote to stabilize moods, starting Seroquel for moods and agitation symptoms, and continuing Vyvanse.

On November 12, 2015, plaintiff reported Effexor withdrawal symptoms of dizziness, feeling weepy and nausea.  (Tr. 711-12).  She felt "doped" on Seroquel and it took a long time to fall asleep and forever to get moving.  Her moods were up and down and she was weepy at times.  Work was "okay" and she got along with the customers, but she was not sure about her concentration.  Dr. Kotwal opined that plaintiff's moods were worse and her cycling had also elevated.  Plaintiff had elevated liver function tests (LFTs) related to Depakote or an infectious process, so that lab work had to be repeated.  Dr. Kotwal assessed a GAF score of 55.  Dr. Kotwal adjusted plaintiff's medications by discontinuing Seroquel because plaintiff was not tolerating it well.  Dr. Kotwal planned to consult with plaintiff's family physician, Dr. Katherine F. Dumont, M.D.

On December 17, 2015, plaintiff complained of depression, mood swings, difficulty functioning and ADHD.  (Tr. 709-10).  She reported that although she had felt agitated and angry for a while, she was feeling pretty good overall.  She reported her sleep "is not great" and that she had "holiday stress."  Her GAF score was 65.

On January 21, 2016, plaintiff reported that overall she was "doing good."  (Tr. 741-48).  She was in school and thinking of going further to get her Masters.  She reported her "concentration is not so good in very long classes" and she has difficulty thinking or organizing her thoughts, but Vyvanse helped a lot by calming her down and allowing her to organize her thoughts and complete her projects.  Her moods were good.  She had been "a little weepy" since the weather was cold and grey.  Plaintiff reported her migraines were better on Depakote.  Dr.

19

Kotwal opined that plaintiff's moods were better but she still had issues.  Dr. Kotwal assigned

plaintiff a GAF score of 65.  Dr. Kotwal discontinued Depakote because plaintiff still had

elevated LFTs.

Dr. Kotwal completed a Mental Impairment Questionnaire on March 4, 2016.  (Tr. 763-

67).  Dr. Kotwal reported that she had seen plaintiff for medication-related sessions that

sometimes included therapy.  Dr. Kotwal listed plaintiff's diagnoses as Bipolar II Disorder,

Anxiety Disorder NOS, H/O Binge Eating Disorder, ADHD, obesity, elevated liver function,

dyslipidemia, and hypothyroidism.  She assessed plaintiff's current GAF score as 55-60.  She

reported that plaintiff was currently on a combination of lithium, a low dose of Saphris, and

Vyvanse.  Plaintiff had not shown a good response to medications and she was not able to sustain

a response.  Dr. Kotwal reported that adverse side effects of medications and multiple

comorbidities contributed to treatment resistance.  (Tr. 763).  She reported that Depakote was

discontinued because plaintiff had adverse hepatic effects and Saphris could not be increased as

it led to sedation and weight gain.  Clinical and mental status examination findings included

constricted affect, tearfulness, a certain awkwardness, failure to make good eye contact, a slow

and hesitant thought process that causes her to pause and did not flow smoothly, suicidal ideation

at times, a depressed mood "very often," careful and guarded presentation, mood swings,

problems with attention, concentration and memory, and limited insight and judgment.  Dr.

Kotwal opined that some of plaintiff's difficulties seemed to stem from social anxiety.

Dr. Kotwal assessed plaintiff's mental abilities and functional limitations on a scale from "none" to "severe"[10] as follows:

- *Understanding and memory*: Mildly limited ability to remember locations and work-like procedures; not limited to mildly limited ability to understand and remember very short and simple instructions; moderately limited ability to understand and remember detailed instructions.

- *Sustained concentration and persistence*: Moderately limited ability to carry out detailed instructions; moderately limited ability to maintain attention and concentration for extended periods; moderately severe limitations on ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

- *Social interaction*: Moderately limited ability to interact appropriately with the general public; moderately limited ability to ask simple questions or request assistance; moderate to moderately severe limitations in ability to accept instructions and respond appropriately to criticism from supervisors; moderate to moderately severe ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and a range in her ability to maintain socially appropriate behavior and to adhere to basic standard of neatness and cleanliness depending on her mental state.

- *Adaptation*: Not limited to mildly limited ability to respond appropriately to changes in the work setting, mild to moderate limited in the ability to travel in unfamiliar places or use public transportation, and can have difficulty with the ability to set realistic goals or make plans independently of others.

- *Functional limitations*: No limitations to moderately severe restriction of activities of daily living; mild to moderately severe difficulties in maintaining social functioning; mild to severe difficulties in maintaining concentration, persistence or pace; and more than 6 episodes of decompensation with a 12-month period, each of at least two weeks duration.

Dr. Kotwal opined that plaintiff's psychiatric condition exacerbated her headaches, that

---

[10] The questionnaire defined the term "mild" as "able to perform designated task or function but has or will have noticeable difficulty (distracted from job activity) no more than 10 percent of the work day or work week" (i.e., one hour or less each day or one-half day or less each week). "Moderate" means "noticeable difficulty (distracted from job activity) from 11-20 percent of the work day or work week" (i.e. more than one hour each day or more than one-half day each week). "Moderately severe" means "noticeable difficulty (distracted from job activity) more than 20 percent of the work day or work week" (i.e., more than one hour and less than two hours each day or one-half to one day each week). "Severe" means "not able to perform designated task or function on regular, reliable, and sustained schedule." (Tr. 764).

she would miss work more than four days per month, that her impairments were expected to last

12 months, and that she would be able to manage her benefits in her own best interest. (Tr. 765-

66).

     *iii.    The ALJ erroneously applied the treating physician rule*

     The ALJ gave "little weight" to Dr. Kotwal's opinions that (1) plaintiff has "moderately

severe to severe limitations in many areas of work-related functioning," and (2) she "has not

shown good response to her medications." (Tr. 27). The ALJ found that first, Dr. Kotwal's

opinions were not consistent with her treatment notes, which the ALJ interpreted as showing that

plaintiff "was doing well with her medications and they were adjusted as necessary." (*Id.*).

Second, the ALJ indicated that Dr. Kotwal's opinions were not consistent with other evidence in

the record showing that plaintiff was working and had earnings at the substantial gainful activity

level during the period of alleged disability; she was attending school and had mentioned that she

would like to pursue a Master's degree; and there was no evidence to show plaintiff had

experienced more than six periods of decompensation. (*Id.*). The ALJ instead adopted the

opinion of nonexamining state agency psychologist Paul Tangeman, Ph.D. (*Id.*, citing Tr. 127-

40). The ALJ did not set forth or discuss Dr. Tangeman's findings anywhere in the written

decision. The ALJ stated only that after having evaluated "the entire record," the ALJ found that

the reviewing psychologist's opinion "is substantially supported by the record as a whole and

must therefore, be given considerable weight." (Tr. 27).

     Plaintiff argues that the ALJ erred by giving less than controlling weight and only little

weight to Dr. Kotwal's assessment. (Doc. 14 at 14-18). Plaintiff alleges that contrary to the

ALJ's finding, Dr. Kotwal's opinion that plaintiff had longstanding problems adjusting to

medications is substantially supported by the record. (*Id*. at 15, citing Tr. 471, 520, 523, 525, 534, 537, 540-41, 584, 636, 678, 737). Plaintiff also alleges that the functional limitations Dr. Kotwal assessed in the areas of ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, which the VE testified would preclude work, are sufficiently supported by evidence documenting: (1) plaintiff's long history of psychiatric symptoms and treatment, (2) Dr. Kotwal's treatment notes, which document continued debilitating mental health issues with some waxing and waning in the severity of the symptoms and difficulty with successfully managing plaintiff's symptoms with medication, and (3) the treatment notes of plaintiff's therapist, Ms. Houston, who referred plaintiff to Dr. Kotwal and continued to treat plaintiff in conjunction with Dr. Kotwal.

Defendant argues that the ALJ's decision to give Dr. Kotwal's opinion "little weight" is substantially supported by the evidence. (Doc. 20 at 12-15). Defendant contends the ALJ properly found Dr. Kotwal's opinion was inconsistent with the record and relied on multiple inconsistencies between his opinion and the record, which were: (1) a lack of evidence to show that plaintiff had more than six episodes of decompensation; (2) evidence showing that plaintiff performed substantial gainful activity during her treatment, was attending school, and mentioned she would like to pursue a Master's degree; and (3) Dr. Kotwal's opinion in January 2016 that plaintiff was "doing good," which the ALJ noted earlier in his written decision when assessing plaintiff's credibility (Tr. 25). (Doc. 20 at 12-13). Defendant also alleges that the ALJ properly relied on an alleged inconsistency between Dr. Kotwal's opinion regarding treatment resistance and medication issues and Dr. Kotwal's own treatment records, which purportedly show that

23

plaintiff had "some improvement with medications" and "was doing well with her medications. . . ." (Doc. 20 at 13, citing Tr. 581-82).

The ALJ's decision to give Dr. Kotwal's opinion less than controlling weight is not substantially supported by the record. The ALJ did not properly evaluate the evidence as a whole when weighing Dr. Kotwal's opinion and finding that it was not well-supported by her own treatment notes. (Tr. 27). The ALJ did not cite to any specific treatment records to support this finding. The ALJ did summarize certain treatment records generated by Dr. Kotwal in his written decision. However, the ALJ's review focused on select records that appear to show plaintiff made fairly steady progress after starting treatment and experienced only occasional setbacks caused by external stressors such as financial concerns, her sister's wedding, and the holidays. (Tr. 25). The ALJ also focused on only one treatment record from January 2016 when assessing plaintiff's credibility to find that plaintiff was doing well with moods, concentration and thought processes, Vyvanse helped calm her down and organize her thoughts better, and Dr. Kotwal thought that overall plaintiff was doing "good." (Tr. 26, citing Tr. 741-48). The ALJ concluded based on his selective review of the records that the "evidence as a whole" did not show that plaintiff "lacks suitable concentration, memory, adaptive, basic cognitive or interpersonal skills for vocational involvement with only occasional changes in the work setting and occasional public interaction" and that her "mental health issues appear to be adjustment related with mild to moderate anxiety and depression." (Tr. 26).

By focusing on a select number of treatment records that appear to show fairly steady progress over the course of plaintiff's treatment with Dr. Kotwal, the ALJ erroneously relied on a skewed depiction of the evidence that improperly disregards significant portions of the treatment

24

records and failed to consider "the nature of mental health impairments, i.e., that the symptoms of such impairments wax and wane from day-to-day." *Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp.3d 912, 923 (S.D. Ohio 2016).  *See also Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 322 (6th Cir. 2015) (citing *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) ("[F]ailure to consider the record as a whole undermines the Secretary's conclusion."); *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) ("Substantiality of the evidence must be based upon the record taken as a whole.")).  In actuality, when read as a whole, Dr. Kotwal's treatment records show that plaintiff experienced repeated flare ups of her mental health symptoms over the course of her treatment with Dr. Kotwal.

Dr. Kotwal reported plaintiff's complaints of ongoing problems with depression and mood stabilization and made mental status examination findings and notes that documented continuing problems with focus, concentration and maintaining her school schedule into 2016. In October 2013, plaintiff reported that it was "difficult to function outside of her home, either crying spells or everything else gets too much."  (Tr. 550).  In April 2014, Dr. Kotwal reported that plaintiff struggles with depression with "significant social anxiety and avoidance behaviors[;] she has tried to work several times but not [sic] able to sustain due to her depression and anxiety."  (Tr. 581-82).  Dr. Kotwal adjusted plaintiff's medications to target depression, anxiety and worries, performed CBT-type work, and encouraged plaintiff to challenge herself to increase her social activities.  In April of 2015, plaintiff reported that she had trouble pulling herself out of bed and she screened positive for ADHD.  (Tr. 723-24).  She complained of racing thoughts and impulsivity.  Dr. Kotwal opined that although plaintiff was improved, she still had "significant limitations in her ability to function fully in different aspects of her daily activities -

psychosocial, personal and work." (Tr. 723-24; Tr. 721-22). In June 2015, plaintiff reported that the month had been "rough," starting with a crying spell and continuing with depression or low mood for three weeks with no trigger, and sleep was problematic. (Tr. 719-20). Dr. Kotwal reported that plaintiff had some cycling with lower moods, and she performed CBT work to target "anxiety, cognitive and psychosocially limiting/challenging cognitions." (*Id.*). In October 2015, mental status examination findings included "cutting behavior, raging thoughts" and plaintiff was tearful during the session. (Tr. 713-14). In November 2015, plaintiff reported her moods were up and down and she was weepy at times, and Dr. Kotwal opined her moods were worse and cycling had elevated. (Tr. 711-12). In December 2015, plaintiff reported feeling agitated and angry for a while and complained of sleep issues. (Tr. 709-10). In January 2016, plaintiff reported that she was in school, her concentration was "not so good in very long classes," she had difficulty thinking or organizing her thoughts but the medication helped, her moods were good but she had been a little weepy, and her migraines were better on Depakote. (Tr. 741-48). She was thinking of pursuing a Master's degree. Dr. Kotwal opined that plaintiff's moods were better but she still had issues. (*Id.*).

Viewed in their entirety, Dr. Kotwal's treatment records demonstrate that although plaintiff experienced some periodic improvement in her symptoms, she also experienced ongoing issues and repeated flare ups of her symptoms. Dr. Kotwal's treatment notes document continued problems with mood cycling, attention and concentration deficits, and sleep problems, among other issues. Dr. Kotwal's treatment notes also amply document ongoing problems in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. The ALJ erred by failing to consider the records as a whole when evaluating

whether Dr. Kotwal's assessment was supported by her own treatment notes.  *Winn*, 615 F. App'x at 322.

Viewed as a whole, the treatment records also support Dr. Kotwal's opinion that plaintiff had not shown a good response to her medication, she was not able to sustain a response, and adverse side effects and multiple comorbidities contributed to treatment resistance.  (Tr. 763). Dr. Kotwal adjusted plaintiff's medications repeatedly over the course of her treatment because of inefficacy of the prescribed medications and adverse side effects.  *See* Tr. 540-42, 5/21/2013-Wellbutrin decreased, Celexa prescribed, Saphris started; Tr. 546-48, 6/11/2013- Topamax started; Tr. 588-90, 7/9/2013- Topamax discontinued, Geodon started, Saphris discontinued, Citalopram tapered down; Tr.  543-45, 7/30/2013, standing order for Benadryl for insomnia issued; Tr. 591-93, 9/9/13- Saphris increased to target mood stability, Geodon decreased; Tr. 586-87, 12/3/2013- Synthroid had been decreased due to underactive thyroid, Citalopram dose was increased; Tr. 583-85, 2/15/2014- Saphris discontinued because drawbacks outweighed its benefits, Trazadone for insomnia was substituted, and Effexor trial started to target depression, anxiety and migraines; Tr. 581-82, 4/12/2014- Effexor titrated up to target depression, anxieties and worries; Tr. 723-24, 4/2/2015- Vyvanse was started to target symptoms of ADHD and Saphris was started to stabilize moods; Tr. 719-20, 6/4/2015- Effexor was decreased, Vyvanse was increased, Saphris was prescribed to stabilize moods; Tr. 713-14, 10/22/2015- Effexor tapered down, Saphris discontinued, Depakote started to stabilize moods and for symptoms of agitation; Tr. 711-12, 11/12/2015- plaintiff reported withdrawal symptoms from Effexor, feeling of being "doped" on Seroquel, which was discontinued, and liver function tests were elevated possibly related to Depakote; Tr. 741-48, 1/21/2016- Depakote discontinued because plaintiff's

LFTs were still elevated; Tr. 747, 2/17/2016- Lithium added in combination with Saphris and Vyvanse in an attempt to alleviate her symptoms).  The record thus substantially supports Dr. Kotwal's opinion that adverse side effects of medications and multiple comorbidities contributed to treatment resistance.  (Tr. 763).

By rejecting Dr. Kotwal's opinion as to the efficacy of plaintiff's medications and by concluding that plaintiff actually "was doing well with her medications" (Tr. 27), the ALJ improperly "substituted his own lay opinion" for Dr. Kotwal's medical conclusion without relying on other medical evidence or authority in the record and despite overwhelming medical evidence showing that side effects and co-morbidities contributed to plaintiff's treatment resistance to the various medications prescribed for her.  *Mason v. Comm'r of Soc. Sec.,* No. 1:07-cv-51, 2008 WL 1733181, at *13 (S.D. Ohio April 14, 2008) (citations omitted).  *See also Hammock v. Comm'r of Soc. Sec.*, No. 1:12-cv-250, 2013 WL 1721943, at *8 (S.D. Ohio Apr. 22, 2013) (Report and Recommendation), *adopted,* 2013 WL 4080714 (S.D. Ohio Aug. 13, 2013).

Thus, the record does not substantially support the ALJ's finding that Dr. Kotwal's opinion is not well-supported by her treatment notes.  Further, the ALJ did not properly evaluate whether Dr. Kotwal's opinion was not inconsistent with the other substantial evidence in the record.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 376.  The ALJ implicitly found that Dr. Kotwal's opinion was not consistent with evidence showing that plaintiff was working and had earnings at the substantial gainful activity level during the period of treatment; she was attending school and had mentioned that she would like to pursue a Master's degree; and there was no evidence to show plaintiff had experienced more than six

periods of decompensation.  (Tr. 27).  However, in making these findings, the ALJ improperly

failed to mention or discuss significant portions of the record bearing on this prong of the

treating physician analysis.  *Winn*, 615 F. App'x at 322 (citing *Hurst,* 753 F.2d at 519; *Allen,* 613

F.2d at 145).

First, the ALJ relied on plaintiff's work and schooling history during the period of

alleged disability to reject Dr. Kotwal's assessment.[11]  Plaintiff's work history and ability to

attend school are relevant to the disability determination.  However, in taking plaintiff's work

history and earnings into account when making this determination, the ALJ failed to consider

evidence in the record that showed plaintiff struggled to maintain steady employment and attend

school on a regular basis.  (*See, e.g.* Tr. 500- plaintiff reported to Dr. Dumont in June 2012 that

she was missing work because she could not make herself go outside and that she had tried

working different jobs to avoid pursuing disability but without success; Tr. 581-82- Dr. Kotwal

opined in April 2014 that plaintiff "has tried to work several times but not able to sustain due to

her depression and anxiety"; Tr. 723-24- Plaintiff reported to Dr. Kotwal in April 2015 that she

had issues with focus in grade school that became more problematic in college, and Dr. Kotwal

opined that plaintiff was doing "better than before though even at this [sic] has significant

limitations in her ability to function fully in different aspects of her daily activities -

psychosocial, personal and work"; Tr. 713-14- plaintiff had worked eight days in a row and

combined with other stressors, including a trip, she felt "like a raw nerve" and could not filter).

Further, the ALJ relied on plaintiff's statement that she would like to pursue a Master's degree,

---

[11] The ALJ found that plaintiff engaged in substantial gainful activity after the alleged onset date but deferred
additional development of the record on this point because he found that plaintiff was disabled at step five of the
sequential evaluation process.  (Tr. 21).

but the ALJ did not consider whether this was a tenable goal in view of plaintiff's struggle to complete college and Dr. Kotwal's assessment that plaintiff had problems with setting realistic goals and making plans independently of others.  (*See* Tr. 765).  Thus, the ALJ did not properly consider all of the relevant evidence in implicitly finding that plaintiff's work history and schooling were inconsistent with the functional limitations Dr. Kotwal assessed.

Critically, the ALJ also failed to consider whether Dr. Kotwal's assessment was consistent with the treatment notes of plaintiff's mental health therapist, Ms. Houston.  As discussed more fully in connection with plaintiff's second assignment of error, Ms. Houston is not an "acceptable medical source" under the governing rules and regulations.  *Guyaux v. Comm'r of Soc. Sec.*, No. 13-12076, 2014 WL 4197353, at *22 (E.D. Mich. Aug. 22, 2014) (citing SSR 06-03p, 2006 WL 2329939 (August 9, 2006)). [12] However, the information she provided is relevant and is evidence that is considered by the Commissioner because it "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  *Id.*

Here, the information provided by Ms. Houston is consistent with Dr. Kotwal's treatment records.  Plaintiff began attending counseling session with Ms. Houston in June 2011.  (Tr. 472).  On November 18, 2013, Ms. Houston completed a medical source statement in which she described plaintiff's symptoms as lability, depression, dissociative tendencies, feelings of being disconnected, extreme discomfort around people, crying episodes, cutting behaviors, feelings of

---

[12] SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date.  82 FR 15263-01, 2017 WL 1105348 (March 27, 2017).  Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

worthlessness, inadequacy, difficulty focusing, and difficulty managing money.  (Tr. 553-55).
Ms. Houston described plaintiff as "very bright, creative, artistic, but being around others drains
her."  In describing plaintiff's restrictions in daily activities, Ms. Houston noted difficulty
managing a budget and staying on a job for more than a year, and frequent crying spells at work.
*Id.*  Ms. Houston emphasized that plaintiff's jobs "have typically included working with the
public [and] there lies the problem."  Ms. Houston believed that plaintiff was unable "to tolerate
the stress of being around other people."  She listed plaintiff's diagnoses as schizoid personality
disorder, bipolar disorder, and obsessive-compulsive tendencies "if not OCD."  *Id.*  On March
20, 2014, Ms. Houston completed a second medical source statement.  (Tr. 579-80).  She
reported that plaintiff has dissociative tendencies, depression, social difficulties, impaired
concentration, compulsive spending, and crying spells.  Ms. Houston stated: "I do see a change
in her since [she is] not working.  Still has mood swings, but in therapy [she is] more engaged
and less angry."  *Id.*  Ms. Houston wrote that plaintiff's stressors were "other people, parents,
financial."

Although Ms. Houston's treatment notes comprise a substantial portion of the evidence,
and her assessments document symptoms and findings that appear to be consistent with Dr.
Kotwal's January 2016 opinion, the ALJ erroneously failed to consider whether Ms. Houston's
treatment records and assessments were consistent with Dr. Kotwal's opinion.  Further, the ALJ
improperly failed to consider other evidence related to plaintiff's history of mental health
symptoms and treatment which appears to be consistent with the assessments of both Dr. Kotwal
and Ms. Houston.  The evidence shows that plaintiff has a long psychiatric history dating back to
childhood.  (Tr. 358, 540-41).  Her history includes treatment at Central Clinic in 2006 as a

young adult for symptoms that included panic, anxiety, and trouble concentrating, which were interfering with her academic and occupational functioning.  (Tr. 358-59).  Plaintiff was also treated by her family physician, Dr. Dumont, beginning in June 2012 for problems with her emotions, ineffectiveness of her medication, and difficulty maintaining employment due to her mental health symptoms.  (Tr. 500).  Because the ALJ did not take this evidence into account when evaluating whether Dr. Kotwal's opinion was consistent with the other substantial evidence of record, the ALJ's decision to give Dr. Kotwal's opinion less than controlling weight is not substantially supported.

Even if the ALJ was not bound to give Dr. Kotwal's opinion controlling weight, the ALJ was obligated to apply the factors under 20 C.F.R. §§ 404.1527(c), 416.927(c) and give good reasons for affording Dr. Kotwal's opinion "little weight."  *Wilson*, 378 F.3d at 544.  *See also Blakley*, 581 F.3d at 408.  The ALJ did not comply with his obligations under the regulations. The ALJ did not consider that Dr. Kotwal had seen plaintiff on a regular basis for nearly two years between May 2013 and April 2014 and between April 2015 and February 2016 (Tr. 581-609, 709-24, 741-47), and that Dr. Kotwal both prescribed medication and provided counseling. Further, the ALJ did not consider whether Dr. Kotwal's opinions were supported by the entirety of her treatment notes and whether Dr. Kotwal's records were consistent with the treatment records of plaintiff's long-time therapist, Ms. Houston, plaintiff's treating family physician Dr. Dumont, and the other medical evidence related to plaintiff's mental health impairments and treatment.  Finally, the ALJ did not consider Dr. Kotwal's specialization as a psychiatrist.  The ALJ did not give "good reasons" that are supported by the evidence in the case record for the weight he gave Dr. Kotwal's opinion.  *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5.

32

Meaningful review of the ALJ's application of treating physician rule is impossible here.
*Wilson*, 378 F.3d at 545.  Plaintiff's first assignment of error should be sustained.

### 2. Evaluation of treating therapist Ms. Houston's assessments

Plaintiff alleges as her second assignment of error that the ALJ failed to properly consider
her treating therapist's opinions by not even discussing the opinions in his decision.  (Doc. 14 at
18).  The Commissioner maintains that the ALJ read and discussed Ms. Houston's opinions and
was not obligated to assign them any particular weight.  The Commissioner also contends that
accepting plaintiff's argument that Ms. Houston's statements are consistent with Dr. Kotwal's
opinion, the same reasons the ALJ gave for discounting Dr. Kotwal's opinion apply to Ms.
Houston's statements.  The Commissioner further argues that any error in this respect is harmless
because Ms. Houston's statements were from an "other source," and "only acceptable medical
sources can give [] medical opinions" under SSR 06-03p.  (Doc. 20 at 15-17).

#### i. *Standard for evaluating non-acceptable medical source*

Under the regulations and rulings applicable to plaintiff's claim, only "acceptable
medical sources" as defined under former 20 C.F.R. §§ 404.1513(a), 416.913(a) can provide
evidence which establishes the existence of a medically determinable impairment, give medical
opinions, and be considered treating sources whose medical opinions may be entitled to
controlling weight.  *See* SSR 06-03p, 2006 WL 2329939, *2 (Soc. Sec. Admin. Aug. 9, 2006).
*See also Guyaux,* 2014 WL 4197353, at *19.  Ms. Houston, a licensed clinical counselor, is not
considered an acceptable medical source and instead falls under the category of "other sources."
*See* 20 C.F.R. §§ 404.1513(d). 416.913(d).  Although information from "other sources" cannot
establish the existence of a medically determinable impairment, the information "may provide

insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939, at *2; 20 C.F.R. §§ 404.1513(d), 416.913(d).

While an ALJ is required to weigh and provide "good reasons" for discounting the weight given to a treating source opinion, an ALJ is not required to explain the weight given to "other sources."  *Gayheart,* 710 F.3d at 376; Soc. Sec. Reg. No. 06-03p, 2006 WL 2329939, at *6. Opinions from medical sources who are not "acceptable medical sources," such as licensed therapists, should be evaluated on key issues such as the claimant's symptoms, diagnosis, prognosis, restrictions, and what the individual can still do despite the impairments.  SSR 06-03p, 2006 WL 2329939, *5.   Factors for weighing the opinions of medical sources who are not "acceptable medical sources" include the nature and length of the treatment relationship, the consistency of the opinion with other evidence, the degree to which the source presents relevant evidence to support her opinion, how well the source explains the opinion, the source's specialty or area of expertise, and any other factors that tend to support or refute the opinion.  *Id.*, *4-5. *See also Cruse v. Comm'r of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).  The ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning."  *Id.* (quoting SSR 06-03p).

ii.      *The ALJ erred by failing to consider Ms. Houston's assessments*

The ALJ's did not consider the treatment records and assessments provided by Ms. Houston as required under the Social Security rules and regulations. The ALJ mentioned that Ms. Houston had treated plaintiff and her treatment notes were part of the record.  The ALJ did not discuss Ms. Houston's notes and findings and evaluated the opinions in accordance with the

applicable regulations.  This was error.  Plaintiff treated with Ms. Houston over the course of several years.  Ms. Houston's treatment notes, objective findings and opinions appear to be quite consistent with Dr. Kotwal's objective findings and opinions.  Yet, the ALJ gave no indication whatsoever that he took Ms. Houston's treatment notes and assessments into consideration. While the Commissioner is correct that the opinions of therapists are not from "acceptable medical sources," the ALJ is not free to ignore a treating therapist's assessments.  Plaintiff's second assignment of error should be sustained.

### 3.    Non-severe impairment finding

Plaintiff alleges her final assignment of error that the ALJ erred in determining that her migraine headaches are not a severe impairment which could cause plaintiff to miss additional days of work.  (Doc. 14 at 19).

An impairment is considered "severe" unless "the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities."  Social Security Ruling 85-28, 1985 WL 56856, at *3 (1985).  The claimant's burden of establishing a "severe" impairment during the second step of the disability determination process is a "*de minimis* hurdle." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "Under [this] prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.*

An ALJ's failure to find a severe impairment where one exists may not constitute reversible error where the ALJ determines that a claimant has at least one other severe impairment and continues with the remaining steps of the disability evaluation. *Maziarz v.*

35

*Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  This rule is predicated

on the notion that the ALJ "properly could consider [the] claimant's [non-severe impairments] in

determining whether [the] claimant retained sufficient residual functional capacity to allow [her]

to perform substantial gainful activity."  *Id.*

      Here, the record includes evidence that plaintiff's impairments include migraine

headaches.  In April 2013, plaintiff's primary care physician, Dr. Dumont, opined plaintiff's

complaints of "phantom smells" could be either migrainous auras or hallucinations, and Dr.

Dumont prescribed Nortriptyline for migraine prevention.  (Tr. 516-18).  In July 2013, plaintiff

reported to Dr. Kotwal she had a headache the week prior but no migraines.  (Tr. 544).  In June

2013, plaintiff reported she had headaches daily for the past two weeks and which caused her to

leave work early one day, and she was not sure if her headaches were a side effect of Saphris.

(Tr. 546-48).  Dr. Kotwal started her on a trial of Topamax to target migraines.  Plaintiff reported

in July 2013 that her migraines were not so severe that she had to see a doctor.  (Tr. 588-90).  In

January 2014, when plaintiff saw Dr. Dumont for medication refills, she reported that she was

getting headaches daily and migraines about once a week.  (Tr. 634).  Other than stating that she

had to leave work early one day, plaintiff did not report that her migraines interfered with her

ability to function in any respect.  Thus, the ALJ did not err by finding that plaintiff's migraine

headaches were not a severe impairment.  Plaintiff's third assignment of error should be

overruled.

### III. Conclusion

      In determining whether this matter should be reversed outright for an award of benefits or

remanded for further proceedings, the Court notes that all essential factual issues have not been

resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings with instructions to the ALJ to reweigh the opinion of the treating psychiatrist, evaluate the evidence and assessments provided by plaintiff's mental health therapist, and elicit further medical and vocational testimony as warranted.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and this matter be **REMANDED** for further proceedings consistent with this opinion.

Date:   8/16/18                          *s/Karen L. Litkovitz*
                                          Karen L. Litkovitz
                                          United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

HEATHER A. WERT,                                    Case No. 1:17-cv-477
     Plaintiff,                                  Barrett, J.
                                                                  Litkovitz, M.J.

     vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

38